## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ED PENNING, individually and on behalf of all other persons similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| THE INTERNATIONAL BUSINESS MACHINES, INC., | |
| Defendant. | |

Dated: November 4, 2024

**BURSOR & FISHER, P.A**.
Joseph I. Marchese
Max S. Roberts
Julian C. Diamond
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jmarchese@bursor.com
          mroberts@bursor.com
          jdiamond@bursor.com

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

**PAGE**

NATURE OF THE ACTION .......................................................................................1

THE PARTIES.........................................................................................................1

JURISDICTION AND VENUE .................................................................................3

STATEMENT OF FACTS ........................................................................................3

I.    DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER, AND
CONSUMERS WITH ACCOUNTS ARE SUBSCRIBERS ................................. 3

II.    DEFENDANT KNOWINGLY DISCLOSES CONSUMERS'
PERSONALLY IDENTIFIABLE INFORMATION TO THIRD PARTIES,
AND WILLFULLY PROCURES THIRD PARTIES TO INTERCEPT
THE CONTENTS OF WEBSITE COMMUNICATIONS ................................... 5

    A.    Testing Reveals That Defendant Illegally Shares Its'
Consumers PII And Video-Viewing Information With Third
Parties, And That Third Parties, As Procured By Defendant,
Intercept The Contents Of Website Users' Communications.................... 5

        1.    Overview Of mParticle ........................................................ 7

        2.    Overview Of AdNexus/Xandr ....................................... 8

    B.    Defendant Discloses PII To The Third Parties ........................................... 9

        1.    Defendant Discloses Users' Names And E-Mail
Addresses To The Third Parties.................................................. 10

        2.    Defendant Discloses Users' Precise Geolocation To
Third Parties, And Third Parties Intercept Users'
Precise Geolocation ..................................................................... 11

        3.    Defendant Discloses Information Identifying Which
Specific Videos Were Watched By Which Specific
Users, And Third Parties Intercept Information
Identifying Which Specific Videos Were Watched
By Which Specific Users............................................................. 13

    C.    Defendant Discloses Personally Identifiable Information To
Third Parties For The Purpose Of Marketing, Advertising,
And Website Analytics ............................................................................. 15

1.    Defendant Discloses Personally Identifiable
Information To mParticle For The Purpose Of
Marketing, Advertising, And Website Analytics.......................... 15

2.    Defendant Discloses Personally Identifiable
Information To AdNexus/Xandr For The Purpose
Of Marketing, Advertising, And Website Analytics ................... 20

D.    Defendant Knowingly Discloses Its Consumers' PII To
mParticle And AdNexus/Xandr .................................................. 23

CLASS ALLEGATIONS ................................................................................24

CAUSES OF ACTION ...................................................................................26

Count I – Violation Of The VPPA, 18 U.S.C. § 2710................................. 26

Count II – Unjust Enrichment....................................................................... 29

PRAYER FOR RELIEF ................................................................................31

JURY TRIAL DEMANDED.........................................................................31

Plaintiff Ed Penning ("Plaintiff"), individually and behalf of all others similarly situated, brings this class action against Defendant The International Business Machines Corporation ("Defendant" or "IBM"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action suit brought against Defendant The International Business Machines, Inc. ("IBM" or "Defendant") for violating the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA").

2.      Defendant owns and operates The Weather Channel website, weather.com (the "Website"), which provides pre-recorded video content for weather-related news stories.

3.      Unbeknownst to Plaintiff and Class Members, Defendant knowingly and willfully disclosed its users' personally identifiable information—including a record of every video viewed by the user—to unrelated third parties, mParticle and AdNexus (now known as "Xandr"). By doing so, Defendant violated the VPPA.

4.      Between September and October 2024, Plaintiff visited the Website and watched pre-recorded videos while signed in to his Website account. During these visits, Defendant transmitted Plaintiffs' video-viewing information and personally identifying information ("PII") to mParticle and AdNexus/Xandr.

5.      Plaintiff brings this action for damages and other legal and equitable remedies resulting from Defendant's violations of the VPPA and unjust enrichment.

## THE PARTIES

6.      Plaintiff Ed Penning is a resident of California and has an intent to remain there and

is therefore a citizen of California. Mr. Penning created a Website account in or about September 2024 and signed up to receive e-mail updates from Defendant. Most recently, in or about October 2024, prior to the filing of this lawsuit, Mr. Penning browsed the Website on his computer and viewed pre-recorded videos on the Website while signed into his Website account.

7.      As alleged in more detail below, when Mr. Penning watched a pre-recorded video on the Website, Mr. Penning's full name, gender, e-mail address, precise geolocation, the name of the videos he watched, and the URLs of videos he watched—which listed the name of the video— were disclosed by Defendant to third parties, mParticle and AdNexus/Xandr.

8.      Using the information they acquired through the disclosure and interception of Mr. Penning's user data, mParticle and AdNexus/Xandr were able to analyze and track Mr. Penning's activity across the Website, target Mr. Penning with relevant advertising, and assist Defendant with revenue generation by factoring Mr. Penning's user data into a real-time bidding process.

9.      At all times relevant, Mr. Penning was unaware that his full name, gender, e-mail, precise geolocation, names of videos watched, and URLs of videos watched were being sent to and intercepted in real-time by mParticle and AdNexus/Xandr, nor did Mr. Penning consent to the same.

10.     Mr. Penning never consented, agreed, nor otherwise permitted Defendant to disclose his personally identifying information to third parties, and certainly did not do so for purposes violative of the VPPA.

11.     Likewise, Defendant never gave Mr. Penning the opportunity to prevent the disclosure of his PII by third parties.

12.     Defendant IBM is a New York company with its principal place of business at 1 New Orchard Road, Armonk, NY 10504. IBM owns and operates Weather.com.

## JURISDICTION AND VENUE

13.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the VPPA is a federal statute.

14.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and at least one member of the proposed class is citizen of state different from at least one Defendant.

15.    This Court has general personal jurisdiction over Defendant because Defendant maintains its principal place of business in New York.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District.

## STATEMENT OF FACTS

I.    **DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER, AND CONSUMERS WITH ACCOUNTS ARE SUBSCRIBERS**

17.    Defendant is one of the largest technology companies in the world.

18.    One of Defendant's ventures is the Weather Channel Website, which prides itself on being "America's #1 Weather Network" with a "daily focus on climate news and best-in-class severe weather coverage."[1]  In more recent years, the Weather Channel has also focused on providing more entertainment-based ventures, such as *Wake Up With Al [Roker]*.

19.    Weather.com was visited over 840 million times in September 2024 alone.[2]

---

[1] https://www.weathergroup.com/brands/the-weather-channel.

[2] https://www.similarweb.com/website/weather.com/#overview.

20.     While The Weather Channel television network provides live broadcasts, the Website focuses on the provision of pre-recorded, weather-related content.  This content can be found under a "Video" tab on the Website:



21.     Through its operation of the Website, Defendant is a "video tape service provider," 18 U.S.C. § 2710(a)(4), because the provision of pre-recorded video content is "a focus of the [D]efendant's work."  *In re Vizio, Inc., Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017).

22.     While all videos on the Website are free to watch, consumers can create an account on the Website.  In exchange for providing Defendant (but not third parties) with their PII, consumers receive certain benefits such as "sav[ing] your favorite locations and forecast preferences across devices, and set[ting] up your own weather dashboard."  Consumers can also "[s]ign up for the Morning Brief – a weekday newsletter with your local forecast, daily insights,

weather stories and our meteorologists' top picks."  In addition, consumers can sign up to simply "[g]et emails from The Weather Channel with [Defendant's] latest offers, updates, and more."[3]

23.    Thus, Website visitors become "consumers" or "subscribers" of Defendant's in at least two ways.  *First*, consumers who create a free account subscriber to Defendant's Website— the medium through which Defendant provides pre-recorded video content—and receive various benefits in exchange for providing their PII to Defendant.  And *second*, consumers who sign up for The Morning Brief or e-mail updates receive the newsletter or various e-mails in exchange for providing their PII to Defendant.  In either case, such visitors are "consumers" because (i) they signed up for a "good or service" (the Website itself and/or the newsletter) provided by a video tape service provider (Defendant); and (ii) provided their PII in exchange for that good or service. *See Salazar v. National Basketball Association*, 118 F.4th 533, 546-552 (2d Cir. 2024).

## II.    DEFENDANT KNOWINGLY DISCLOSES CONSUMERS' PERSONALLY IDENTIFIABLE INFORMATION TO THIRD PARTIES, AND WILLFULLY PROCURES THIRD PARTIES TO INTERCEPT THE CONTENTS OF WEBSITE COMMUNICATIONS

### A.    Testing Reveals That Defendant Illegally Shares Its' Consumers PII And Video-Viewing Information With Third Parties, And That Third Parties, As Procured By Defendant, Intercept The Contents Of Website Users' Communications

24.    In Summer 2023, Plaintiff's counsel retained a private research company to review the Website and conduct a dynamic analysis.  A "dynamic analysis" records the transmissions that occur from a user's device or web browser.

25.    The researchers tested what information (if any) was disclosed when a user visits the Website and watches a pre-recorded video or takes other actions (*e.g.*, clicking on various menu options).  The analysis revealed Defendant disclosed information to third parties sufficient

---

[3] https://weather.com/signup.

to identify specific Class Members and the specific videos they watched, and that Defendant procured third parties to intercept in real time the content of Class Members' communications with the Website.

26.    The analysis first established that Defendant incorporates multiple "software development kits" ("SDKs") and "application programming interfaces" ("APIs") into the Website.

27.    SDKs are "set[s] of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For example, Google Analytics provides an SDK that gives insight into user behavior, engagement, and cross-network attribution."[4]

28.    APIs "enable[] companies to open up their applications' data and functionality to external third-party developers, business partners, and internal departments within their companies."[5]    APIs "act[] an intermediary layer that processes data transfer between systems, letting companies open their application data and functionality to external third-party developers [and] business partners."[6]    APIs can "work[] as a standalone solution or included within an SDK … [A]n SDK often contains at least one API."[7]

29.    Crucially, these third party APIs are run and administered by the third parties themselves, rather than being tools through which Defendant records its own data.

---

[4] *API vs. SDK: The Difference Explained*, GETSTREAM, https://getstream.io/glossary/api-vs-sdk/.

[5] APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

[6] *What Is An Api?*, IBM, https://www.ibm.com/topics/api.

[7] *SDK vs. API: What's the Difference?*,  IBM (July 13, 2011), https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface).

30.     As relevant here, Defendant provides mParticle[8] and AdNexus/Xandr[9] access to Website data through their respect SDKs and APIs.  mParticle provides extensive customer analytics, while AdNexus/Xandr is a major advertising and marketing platform.

31.     The dynamic analysis found that when a user views a video on the Website, Defendant transmits to these third part ies information sufficient to permit an ordinary person to identify a specific person's video-viewing behavior, and the content of a user's communications with the Website is intercepted in real time by these third parties, as procured by Defendant.

32.     Specifically, when a user creates a Website account and views a video on the Website, the following information is intercepted by or transmitted to the third parties, mParticle and AdNexus/Xandr:

| THIRD PARTY | VIDEO INFO | PERSONAL INFO | OTHER INFO |
|:---:|:---:|:---:|:---:|
| **mParticle** | Name, URL | geolocation, email, gender, name | |
| **AdNexus** | Name | geolocation, email, gender, name | AAID |

33.     Although this testing was conducted a year ago, the results remain valid today, as both third-party SDKs remain present on the Website.

>    *1.     Overview Of mParticle*

34.     mParticle is "one of the leading customer data platforms, serving hundreds of global brands and helping them turn data to insights, and insights to action."[10]

35.     At a high level, mParticle uses the data it receives and collects from the Website to,

---

[8] https://www.mparticle.com/

[9] https://about.ads.microsoft.com/en-us/solutions/xandr/xandr-premium-programmatic-advertising

[10] https://www.mparticle.com/about-us/

among other things, provide "real-time personalization and targeting," provide "predictive," "AI-powered insights … on each customer profile that inform how to preempt churn, improve return on ad spend, and more."[11]

36.     When a Website account user views a pre-recorded video on the Website, Defendant discloses to mParticle at least the following information: (i) a user's name and gender, (ii) a user's e-mail address, (iii) a user's precise geolocation, (iv) the name of the pre-recorded video watched by the user, and (v) the URL of the pre-recorded video watched by the user, which also contains the name of the video:



2.     *Overview Of AdNexus/Xandr*

37.     AdNexus/Xander is a premium advertising platform.[12] At a high level,

---

[11] https://www.mparticle.com/solutions/real-time-personalization-targeting/.

[12] https://about.ads.microsoft.com/en-us/solutions/xandr/xandr-premium-programmatic-advertising

AdNexus/Xander uses the data it receives and collects from the Website to, among other things, "help advertisers engage with audiences using … digital video,"[13] analyze the effectiveness of advertising campaigns,[14] and "monetize proprietary data."[15]

38.     When a Website account user views a video on the Website, Defendant discloses to AdNexus/Xander at least the following information: (i) a user's name and gender, (ii) a user's e-mail address, (iii) a user's precise geolocation, and (iv) the name of the pre-recorded video watched by the user:





**B.     Defendant Discloses PII To The Third Parties**

39.     The VPPA prohibits the "knowing[] diclos[ure]" by a "video tape service provider" of the "personally identifiable information concerning any consumer of such provider."  18 U.S.C.

---

[13] https://about.ads.microsoft.com/en-us/solutions/xandr/advertiser-platform-invest-dsp-premium-content.

[14] *Id.*

[15] https://about.ads.microsoft.com/en-us/solutions/xandr/curation-platform-self-serve-monetization-solution

§ 2710(b)(1).   "[T]he term 'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provide."  18 U.S.C. § 2710(a)(3).

40.   Thus, to be liable under the VPPA, the third party must receive information sufficient to identify a particular user.  As alleged below, the names, e-mail addresses, and precise geolocation disclosed to mParticle and AdNexus/Xandr fit the bill.

### 1.   Defendant Discloses Users' Names And E-Mail Addresses To The Third Parties

41.   Without a doubt, someone's full name is sufficient to identify a particular person.  However, the same is true of an e-mail address.

42.   An email address is a unique string of characters which designate an electronic mailbox.  As industry leaders,[16] trade groups,[17] and courts agree,[18] an ordinary person can use an email address to uniquely identify another individual.  Indeed, there exists multiple services that enable anyone with internet access and a credit card to look up who owns a particular email address.[19]

43.   mParticle also admits an "email address is more likely to be unique to a single user than [some other identifiers]."[20]

---

[16] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[17] NETWORK ADVERTISING INITIATIVE, NAI CODE OF CONDUCT 19 (2019), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[18] *See, e.g.*, *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual.").

[19] *See, e.g.*, www.beenverified.com.

[20] https://docs.mparticle.com/guides/idsync/identify-users/

44.    As the dynamic analysis establishes, when a user with an account watches a pre-recorded video on the Website, Defendant discloses users' names and e-mail addresses to mParticle and AdNexus/Xandr.

       2.    *Defendant Discloses Users' Precise Geolocation To Third Parties, And Third Parties Intercept Users' Precise Geolocation*

45.    Geolocation is "the identification of the real-world geographic location of an object."[21]  Geolocation identifies an object by "generating a set of geographic coordinates such a latitude and longitude through GPS and using the coordinates to determine a meaningful location."[22]

46.    Geolocation is considered precise when it provides street level accuracy. Defendant discloses such precise geolocation here.  Specifically, Defendant discloses to mParticle and AdNexus/Xandr users' geolocation with more than three decimal places of accuracy, meaning mParticle and AdNexus/Xandr could identify users within forty feet of their actual location.

47.    Precise geolocation can be used by anyone to uniquely identify a person.  A study in 2013, for example, analyzed mobility data for 1.5 million people, finding that researchers needed only four randomly chosen spatio-temporal points (points that represent the time and location of a specific event, such as watching a video) to uniquely identify 95% of the people (approximately 1.425 million out of 1.5 million) in the dataset.[23]

---

[21] WHAT IS GEOLOCATION?, https://www.indicative.com/resource/geolocation/.

[22] WHAT IS GEOLOCATION?, https://www.indicative.com/resource/geolocation/.

[23] Yves-Alexandre de Montjaye, et al., *Unique in the Crowd: The privacy bounds of human mobility*, SCIENTIFIC REPORTS 2 (Feb. 4, 2013), https://www.nature.com/articles/srep01376.

48.    This data may also be used to track consumers to sensitive locations, including places of religious worship, places that may be used to infer an LGBTQ+ identification, domestic abuse shelters, medical facilities, and welfare and homeless shelters.

49.    By plotting the latitude and longitude coordinates including geolocation data using publicly available map programs, it is possible to identify which consumers' mobile devices visited reproductive health clinics. Similar methods may be used to trace consumers' visits to other sensitive locations.

50.    As Paul Ohm, a law professor and privacy researcher at Georgetown University Law Center, explains it: "[r]eally precise, longitudinal geolocation information is absolutely impossible to anonymize." [24]   In fact, out of all identifiers, "D.N.A. is probably the only thing that's harder to anonymize than precise geolocation information." [25]

51.    By disclosing users' geolocation data to third parties, and by procuring third parties to collect geolocation, Defendant discloses to third parties information that an ordinary person could use to identify Defendant's users. [26]

52.    Companies collect and disclose geolocation so they can maximize their advertising revenue.  As a *New York Times* article explained: "For brands, following someone's precise movement is key to understanding the 'customer's journey'—every step of the process from seeing an ad to buying a product."

---

[24] Stuart A. Thompson & Charlie Warzel, *Twelve Million Phones, One Dataset, Zero Privacy* N.Y. Times (Dec. 19, 2019), https://www.nytimes.com/interactive/2019/12/19/opinion/location-tracking-cell-phone.html.

[25] *Id.*

[26] *See Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016).

53.    Marketers consider geolocation "the Holy Grail of advertising" because it creates "the complete picture that connects all of our interests and online activity with our real-world actions."[27]

54.    Defendant's conduct is self-serving, as mParticle and AdNexus/Xandr use the geolocation they receive to enhance Defendant's marketing efforts, advertising, and Website analytics.

### 3.    Defendant Discloses Information Identifying Which Specific Videos Were Watched By Which Specific Users, And Third Parties Intercept Information Identifying Which Specific Videos Were Watched By Which Specific Users

55.    As alleged above, Defendant discloses the full names of the pre-recorded videos watched by Website users to mParticle and AdNexus/Xandr.

56.    In particular, Defendant discloses the URL of the pre-recorded videos watched by Website users to mParticle, and mParticle intercepts in transit URL s of the pre-recorded videos watched by Website users.  The URL discloses the exact name of the pre-recorded video, as indicated by the snippet of Website traffic recorded in the analysis:



57.    The transmission of this video information occurs when a user actually watches the specific pre-recorded video, and not simply because a user visits a page with a video and does not

---

[27] *Id.*

watch the video, or visits a page with many videos and the information does not indicate which video is watched.

58.    *First*, both mParticle and AdNexus/Xandr receive the *full name* of the video, not just the URL.  Thus, it is clear from that transmission the title of the video watched by the user, not just that a user visited a page with a video.

59.    *Second*, the transmissions to mParticle and AdNexus/Xandr indicate that a video was indeed watched.  For instance, the mParticle transmission specifically includes the value "'event name' : 'video started'," as well as the time when that video was watched:

```
"data": {
    "event_name": "video-started",
    "timestamp_unixtime_ms": 1692994139011,
    "session_start_unixtime_ms": 1692992931667,
    "custom_attributes": {
        "pageKey": "video",
        "url": "/news/weather/video/extreme-heat-can-cause-roads-to-buckle-blow-out",
```

60.    The time stamp value is a Unix Timestamp, which "is a way to track time as a running total of seconds.  This count starts at the Unix Epoch on January 1st, 1970 at UTC.  Therefore, the unix time stamp is merely the number of seconds between a particular date and the Unix Epoch."[28]   The time stamp here—1692994139011—is August 25, 2023 at 4:08:59 p.m. Eastern Time.[29]

---

[28] THE CURRENT EPOCH UNIX TIMESTAMP, https://www.unixtimestamp.com/.

[29] *Id*.

61.    Similarly, for AdNexus/Xandr, the network traffic shows the value, "'event_name' : 'module-viewed'," being transmitted, where "module" refers to the video watched.  This is clear from the value, "'moduleTitle,'" which is the name of the video:

```
'data': {
    'custom_event_type': 'other',
    'event_name': 'module-viewed',
    'custom_attributes': {
        'moduleId': 'WxuContentMedia-sidebar-bd88006a-fed4-498d-8241-e7c6050fac3f',  * potential video ID
        'moduleTitle': 'Watch Pavement Blow Out',
```

62.    Thus, mParticle and AdNexus/Xandr not only receive and collect what specific video a user watches, but also that the user in fact watched a specific video.

### C.    Defendant Discloses Personally Identifiable Information To Third Parties For The Purpose Of Marketing, Advertising, And Website Analytics

63.    Defendant discloses PII and video-viewing information to mParticle and AdNexus/Xandr so mParticle and AdNexus/Xandr can help Defendant with marketing, advertising, and analytics.

64.    As alleged above, mParticle and AdNexus/Xandr are designed to analyze Website data, conduct targeted marketing and advertising, and ultimately boost Defendant's revenue from its video-based marketing and advertising on the Website.

### 1.    Defendant Discloses Personally Identifiable Information To mParticle For The Purpose Of Marketing, Advertising, And Website Analytics

65.    As alleged above, mParticle describes itself as a "as one of the leading customer data platforms, serving hundreds of global brands and helping them turn data to insights, and insights to action."[30]

---

[30] https://www.mparticle.com/about-us/.

66.     One of mParticle's key features is "IDSync," "[t]he primary purpose of [which] is to ensure that you are attributing data to the correct user, *which requires you to successfully identify the current user of your app or website.*"[31]

67.     mParticle notes that "*[a]s soon as the user opens your app [or website]*, an identity request is automatically made to mParticle to look for a matching user profile."[32]  mParticle also admits that it receives "the username or email address provided when the user signs up," and uses that information to track users.[33]

68.     Crucially, the default configuration for mParticle is only to collect a user's "customer ID."[34]  Therefore, Defendant had to knowingly and willfully allow mParticle to receive and collect e-mail addresses and geolocation data because otherwise, mParticle would only be receiving and collecting customer IDs.

69.     Once a user has been identified, their actions are tracked across a website like Defendant's, and that "event data" is used to measure website performance and statistics.  Website developers like Defendant can configure mParticle to receive and collect "custom event" data, which covers a wide assortment of activity on a website.[35]

---

[31] https://docs.mparticle.com/guides/idsync/identify-users/ (emphasis added).

[32] *Id.* (emphasis added).

[33] *Id*.

[34] https://docs.mparticle.com/guides/idsync/default-strategy/

[35] https://docs.mparticle.com/developers/sdk/web/event-tracking/

70.    Ironically, the example for "custom event data" mParticle lists in its developer documentation is "Videos Watched":

```
1   mParticle.logEvent(
2     'Video Watched',
3     mParticle.EventType.Navigation,
4     {'category':'Destination Intro','title':'Paris'}
5   );
```

**Capture a Custom Event**

You can quickly log a simple event as follows:

71.    mParticle also allows website developers like Defendant to "track the location of your users."[36]    Again, this is an optional feature, meaning Defendant has to knowingly and willfully allow and procure mParticle to receive and collect geolocation data.

72.    With all of this event and location data, mParticle, ironically again, shows website developers like Defendant how they can violate the VPPA.    In mParticle's developer documentation, it includes the following tutorial:

> The mPTravel app lets users watch video content about travel destinations. This tutorial creates an audience to allow mPTravel to *target users who view content about a particular destination with deals for that destination.*[37]

73.    *First*, mParticle would record the "event data'" for whoever watched a specific video.[38]

---

[36] https://docs.mparticle.com/developers/sdk/web/location/

[37] https://docs.mparticle.com/guides/getting-started/create-an-audience/ (emphasis added).

[38] https://docs.mparticle.com/guides/getting-started/create-an-audience/

74. *Second*, mParticle can include in its "Audience" whoever clicks on and watches that specific video, as well as other attributes like subscription status, geolocation, or any attribute the website developer wants to send or have mParticle collect.[39]



75. *Third*, once a website developer "activates" this "audience," mParticle will begin receiving, collecting, and measuring data that matches the criteria listed above. So, as applied to Defendant's Website, Defendant might create an "audience" of users who watched a specific video from a specific location, and mParticle would receive and collect that data (as well as users' names and e-mail addresses).

76. *Fourth*, after receiving sufficient information, mParticle can forward the "audience" to another third party to conduct marketing. So, in the above example, mParticle could

---

[39] *Id.*

forward the contact information for all "audience" members to Mailchimp, who would send targeted e-mail advertising to users based on the specific video they watched.[40]

77.     All of this is to benefit website developers like Defendant, who send data to mParticle to drive website traffic, conduct targeted marketed campaigns using detailed user data, and increase revenue (*e.g.*, through incentivizing users to purchase products on a website through targeted advertising).

78.     The receipt and collection of this user data also allows mParticle to identify users and build sophisticated user profiles, encompassing everything from a user's name and location to age range and gender[41]:



79.     Defendant uses each and every one of the above-mentioned features of mParticle, among others, on the Website.  Thus, Defendant discloses information to mParticle to perform

---

[40] https://docs.mparticle.com/guides/getting-started/connect-an-audience-output/.

[41] https://www.mparticle.com/platform/detail/profile-api/

extensive Website analytics, conduct targeted marketing campaigns, and improve Website performance—all of which, in turn, generates greater revenue for Defendant.

> 2. *Defendant Discloses Personally Identifiable Information To AdNexus/Xandr For The Purpose Of Marketing, Advertising, And Website Analytics*

80. As alleged above, AdNexus/Xander—now known as "Microsoft Invest"—is a premium advertising platform now owned by Microsoft, and is part of the suite of internet advertising services offered by Microsoft.[42]

81. In particular:

> The [Xandr] platform is a real-time bidding system and ad server. The main processing system is called the "impression bus." The impression bus receives ad requests, applies data to the request, receives bids, makes decisions, serves creatives, logs auctions, etc.

> Ad calls come in via our inventory supply partners: exchanges, SSPs, ad networks, and a few valued publishers.

> …

> Once we get the call, we overlay segment data from our server-side cookie store. Data is added to the cookie store either through Xandr segment pixels or by clients sending us a file of data. We also contact third-party data providers and overlay any available data.

> We contact all of the bidders on our platform. The ad call includes whatever user data belongs to each bidder, and information about the inventory. Bidders have a certain number of milliseconds in which to respond with a bid and the creative they want to serve.

> …

> The impression bus decides which bid wins based on the amount of the bid, and any preferences the publisher has about what they want served on their page. If the call was client-side, [Xandr] serves the

---

[42] https://about.ads.microsoft.com/en-us/solutions/xandr/xandr-premium-programmatic-advertising

ad. If it was server-side, [Xandr] passes the bid and the location of the creative to the partner who will ultimately serve the ad.[43]

82.    To break this down, "real-time bidding" or "RTB" is the process through which advertisers and marketers "buy[] and sell[] ads in real time" to website and mobile users.  After receiving relevant user data, "multiple advertisers [] bid on a single impression of a publisher's inventory, then the winning ad (with the highest bid) is shown to the user."[44]  As an example:

> [t]ake … the moment in a mobile game where the player watches an ad between game levels.  At that moment, the mobile [supply-side platform or SSP] runs an auction for all of the advertisers interested in showing an ad to that player.  The advertisers make their bid and, in a split-second, the highest bidder is chosen.  Their advertisement is then served to the player.[45]

83.    As AdNexus/Xandr notes, there are several key players in the RTB process, which include but are not limited to:

- Publishers (sellers) provide inventory, or the space where ads are displayed.  This may be a website or a mobile app.

- Advertisers or marketers (buyers) purchase inventory for the display of advertisements.  For example, Microsoft, Amazon, and Target are all advertisers.

- Users are the target customers for advertisements.

- Supply Side Platforms (SSPs) enable publishers to access demand from many different networks, exchanges, and platforms through a single interface.  For example, Xandr, Liverail, OpenX, and Pubmatic can act as SSPs.[46]

84.    Each of these entities work together to serve targeted advertisements to users in a process called "ad serving."  To elaborate, "[a]d serving is the process of determining which

---

[43] https://learn.microsoft.com/en-us/xandr/invest/about-invest

[44] https://www.adjust.com/glossary/real-time-bidding/

[45] *Id*.

[46] https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving

advertisement goes in which ad slot on a publisher's webpage or mobile app and then delivering the advertisement."[47]

85.     AdNexus/Xander is a real-time bidding platform (specifically, a SSP) that facilitates this economy.  It provides "targeting, bidding algorithms, multi-currency support, and all the other features of a premium ad server."[48]

86.     A website like Defendant's discloses PII to AdNexus/Xander to maximize revenue by having advertisers bid on which ads will be shown to website users, and then show those users targeted marketing and advertisements based on the user's personal data.

87.     To facilitate the RTB process, however, AdNexus/Xander needs to receive and collect an enormous amount of data about website users.  For instance, one of AdNexus/Xandr's features is "Geo Radius Segments."  "A geo radius segment is a list of latitude, longitude, and radius data.  [A website developer] can use geo radius segments for geographical targeting of multiple user locations."[49]

88.     Thus, if a website developer sends geolocation data to AdNexus/Xander, AdNexus/Xander can create segments of users based on their geolocation.  That geolocation data—or users fitting within a certain geolocation-based segment—would then be shown to advertisers, who would use AdNexus/Xander's RTB platform to bid on showing advertisements relevant to a user's location to each user.

---

[47] *Id.*

[48] https://learn.microsoft.com/en-us/xandr/invest/about-invest

[49] https://learn.microsoft.com/en-us/xandr/monetize/geo-radius-segments

89.     Crucially, "Geo Radius Segments" is an optional feature of AdNexus/Xander, meaning Defendant had to knowingly and willfully enable this feature to disclose and procure AdNexus/Xander to intercept geolocation data.

90.     Another feature of AdNexus/Xander is "video content targeting."  Through this feature, AdNexus/Xander can target users "based on available detail about the specific video content, including the type of programming, the subject matter, the scheduled airtime, and more."[50]

91.     Defendant uses each and every one of the above-mentioned features of AdNexus/Xandr on the Website.  Thus, Defendant discloses information to AdNexus/Xandr to facilitate real-time bidding, serve targeted advertisements on users based on their PII, and generate greater revenue for Defendant through this process.

**D.     Defendant Knowingly Discloses Its Consumers' PII To mParticle And AdNexus/Xandr**

92.     Based on the above, it is abundantly clear that Defendant *knowingly* discloses its users' personally identifiable information to mParticle And AdNexus/Xandr.

93.     Naturally, mParticle And AdNexus/Xandr have access to Website user data through Defendant's efforts; mParticle And AdNexus/Xandr do not simply appear on Defendant's Website.  Accordingly, Defendant must knowingly and willfully allow mParticle And AdNexus/Xandr to collect the aforementioned user data.

94.     Further, Defendant has enabled many optional features of mParticle and AdNexus/Xandr that allow these third parties to collect Penningtional user data, such as e-mail addresses, geolocation, and video-viewing information.

---

[50] https://learn.microsoft.com/en-us/xandr/monetize/video-content-targeting

95.     Dispelling any doubt, Defendant has, for instance, had its executives appear at conferences and talks with mParticle's CEO[51]:

**What's the Role of an App in a Bot Driven World**
Check in: m.me/mobilebeatbot/502

Michael Katz, CEO
Mparticle

Jason Sinnarajah, VP, Business
Development
Weather.com

Mike Ghafferty, CEO
Yelp

Blaise Zerega, Editor-in-Chief
VentureBeat

Adam Medros, SVP Global Product
TripAdvisor



96.     Likewise, mParticle lists "The Weather Channel" as a user of mParticle's "Button" feature, which "provides a way for mobile brands to partner with one another, creating the only simple, scalable, and accurate approach to mobile affiliate acquisition and commerce."[52]

## CLASS ALLEGATIONS

97.     Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), Plaintiff seeks to represent a class of all United States residents who visited Weather.com during the statute of limitations period, created an account on the Website, and watched a pre-recorded video on the Website (the "Nationwide Class").

98.     Plaintiff also seeks to represent a subclass of all Class Members who subscribed to

---

[51] https://www.youtube.com/watch?v=e0PbpWMyRFY

[52] https://www.mparticle.com/blog/button-partnership/

"The Morning Brief" or elected to receive e-mail updates on the Website (the "Subclass").

99.    The Nationwide Class and Subclass shall be collectively referred to as the "Class."

100.    Plaintiff reserves the right to modify the class definition as appropriate based on further investigation and discovery obtained in the case.

101.    Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The precise number of Class Members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants.

102.    Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members.  Common legal and factual questions include, but are not limited to, whether Defendant violated the VPPA and whether Class Members are entitled to actual and/or statutory damages for the aforementioned violations.

103.    The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other class members, visited the Website, created an account and elected to receive e-mail updates, and watched a pre-recorded video on the Website.

104.    Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class Members will be fairly and adequately protected by Plaintiff and his counsel.

105.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members.  Each individual Class Member may lack the

resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

106. Plaintiff brings all claims in this action individually and on behalf of members of the Class against Defendant.

## CAUSES OF ACTION

### COUNT I
### Violation Of The VPPA,
### 18 U.S.C. § 2710

107. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

108. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

109. Defendant is a "video tape service provider" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as it provides video (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via its Website. Specifically, Defendant provides pre-recorded, weather-related videos to consumers on the Website.

110.    Plaintiff and Class Members are "consumers" as defined by the VPPA because they created Website accounts and/or subscribed to The Morning Brief or e-mail updates, through which they provided Defendant (and, without consent, the third parties mentioned in this Complaint) their names and e-mail addresses, which were used to track Plaintiff and Class Members when they viewed video content.  18 U.S.C. § 2710(a)(1).  In return for providing their PII, Defendant also provided Plaintiff and Class Members with various benefits and/or a subscription to The Morning Brief or e-mail updates.  Under the VPPA, therefore, Plaintiff and members of the Classes are "subscribers" of "goods or services [the Website and, for the Subclass, The Morning Brief or e-mail updates] from a video tape service provider."  18 U.S.C. § 2710(a)(1).

111.    Plaintiff and Class Members viewed pre-recorded videos on the Website.  During each of these occasions, Defendant disclosed Plaintiff's and Class Members PII.  Specifically:

- Plaintiff's and Class Members' (i) full names, (ii) e-mail addresses, (ii) precise geolocation, (iii) the name of the pre-recorded video watched by Plaintiff and Class Members, and (iv) the URL of the pre-recorded video watched by Plaintiff and Class Members, which also contains the name of the video, were disclosed to mParticle.

- Plaintiff's and Class Members' (i) full names, (ii) e-mail addresses, (ii) precise geolocation, and (iii) the name of the pre-recorded video watched by Plaintiff and Class Members, and were disclosed to AdNexus/Xandr.

112.    The Website's transmissions of Plaintiff's and Class Members' PII to mParticle and AdNexus/Xandr constitute "knowing[] disclosures" of Plaintiff's and Class Members' "personally identifiable information" to a person as proscribed by the VPPA.  18 U.S.C. § 2710(a)(1).

113.    Under the VPPA, the term "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).  The information disclosed

by Defendant constitutes "personally identifiable information" because it allows an ordinary person to identify Plaintiff and Class Members, as well as which specific videos were watched by Plaintiff and each Class Member.

114.    Plaintiff and Class Members did not provide Defendant with consent to disclose their PII and video-viewing information to third parties, including mParticle and AdNexus/Xandr, "in a form distinct and separate from any form setting forth other legal or financial obligations." 18 U.S.C. § 2710(b)(2)(B)(i).  Nor were Plaintiff and Class Members given the opportunity to prevent the disclosure of their PII and video-viewing to third parties, including mParticle and AdNexus/Xandr, "in a form distinct and separate from any form setting forth other legal or financial obligations," and where Plaintiff and Class Members were provided with the "opportunity, in a clear and conspicuous manner … to withdraw on a case-by-case basis or to withdraw from ongoing disclosures."  18 U.S.C. § 2710(b)(2)(B)(iii).

115.    Defendant's disclosures were not made made in the "ordinary course of business," as the term is defined by the VPPA.  In particular, the Apps' disclosures to mParticle and AdNexus/Xandr were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

116.    On behalf of himself and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting and disclosing a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees, costs, and other litigation expenses.

## COUNT II
**Unjust Enrichment**

117.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

118.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

119.    Plaintiff and Class Members unwittingly conferred a benefit upon Defendant. Defendant procured and retained the contents of Plaintiff's and Class Members' Website communications and valuable personal location information belonging to Plaintiffs and Class Members when it sold this data to third parties or otherwise monetized this data without Plaintiff's and Class Members' consent.

120.    Defendant was enriched when it utilized Plaintiff and Class Members' names, e-mail addresses, and precise geolocation information without consent for Defendant's own financial advantage to optimize its advertising and analytics efforts, including by allowing its paying advertisers to target Plaintiff and Class Members for lucrative advertisements based on videos they had viewed, and to analyze Website data to drive traffic and increase revenue.

121.    Defendant was enriched when it utilized Plaintiff's and Class Members' names, e-mail addresses, and precise geolocation information without consent for its own financial advantage to serve targeted advertisements, to facilitate the real-time bidding process, and to measure performance, all of which enable Defendant to—and which Defendant does use—to create operational efficiencies and be compete with its competitors.

122.    In exchange for Plaintiff's and Class Members' loss of privacy and the financial benefits Defendant enjoyed as a result thereof, including, but not limited to, advertising profits, Plaintiff and Class Members received nothing.

123.    It would be inequitable for Defendant to retain the benefits it has unjustly received. Therefore, as a result of Defendant's actions, Plaintiff and Class Members seek an order that Defendant disgorge the profits and other benefits it has unjustly obtained.

124.    To be clear, Plaintiff's claim for unjust enrichment is not seeking restitution for Defendant's disclosure of Plaintiff's viewing records to third parties. This claim is strictly seeking restitution for Defendant's monetization of the valuable personal information belonging to Plaintiff and Class Members.

125.    Plaintiff has no adequate remedy at law for this claim. Plaintiff pleads his claim for unjust enrichment in the alternative, which inherently would necessitate a finding of no adequate remedy at law. Alternatively, legal remedies available to Plaintiff are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937). Furthermore:

(a)    To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.

(b)    Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Plaintiff seeks such relief here.

(c)    Legal claims for damages are not equally certain as restitution because claims for unjust enrichment entail few elements.

(d)    A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need

not demonstrate the inadequacy of available remedies at law." RESTATEMENT (THIRD) OF RESTITUTION § 4(2).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a)    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class a;

(b)    For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest in all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and cost of suit.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: November 4, 2024        Respectfully submitted,

        **BURSOR & FISHER, P.A**.

        By: */s/ Joseph I. Marchese*
              Joseph I. Marchese

        Joseph I. Marchese
        Max S. Roberts
        Julian C. Diamond

1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jmarchese@bursor.com
        mroberts@bursor.com
        jdiamond@bursor.com

*Attorneys for Plaintiff*