**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JOHN CASTILLO, individually and on behalf of all other persons similarly situated,

Plaintiff,

v.

THE INTERNATIONAL BUSINESS MACHINES, INC., and FRANCISCO PARTNERS MANAGEMENT, L.P.

Defendants.

Case No. 7:24-cv-8380-JGLC

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Hon. Jessica G. L. Clarke

Dated: December 16, 2024

**BURSOR & FISHER, P.A.**
Joseph I. Marchese
Max S. Roberts
Julian C. Diamond
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jmarchese@bursor.com
mroberts@bursor.com
jdiamond@bursor.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS


**PAGE**

NATURE OF THE ACTION ..... 1

THE PARTIES ..... 2

JURISDICTION AND VENUE ..... 4

STATEMENT OF FACTS ..... 5

I. DEFENDANTS ARE VIDEO TAPE SERVICE PROVIDER, AND CONSUMERS WITH ACCOUNTS ARE SUBSCRIBERS ..... 5

II. DEFENDANTS KNOWINGLY DISCLOSE CONSUMERS' PERSONALLY IDENTIFIABLE INFORMATION TO THIRD PARTIES ..... 10

A. Testing Revealed That Defendant IBM Illegally Disclosed Its' Consumers' PII With Third Parties ..... 10

B. Testing Revealed That Defendant Francisco Partners Illegally Discloses Its' Consumers' PII With Third Parties ..... 12

III. THE INFORMATION DEFENDANTS DISCLOSED TO THE THIRD PARTIES CONSTITUTES PERSONALLY IDENTIFIABLE INFORMATION ..... 14

A. Defendants Disclose Consumers' E-Mail Addresses To mParticle And Microsoft ..... 14

B. Defendants Disclose Consumers' Geolocation To The Third Parties ..... 15

C. Defendants Disclose Consumers' Video-Viewing Information To The Third Parties ..... 18

IV. DEFENDANTS DISCLOSE CONSUMERS' PII TO THE THIRD PARTIES FOR THE PURPOSE OF MARKETING, ADVERTISING, AND ANALYTICS ..... 22

A. Defendants Disclose Personally Identifiable Information To mParticle For The Purpose Of Marketing, Advertising, And Analytics ..... 22

B. Defendant IBM Disclosed Website Users' Personally Identifiable Information To Microsoft For The Purpose Of Marketing, Advertising, And Website Analytics .................................... 26

C. Defendant Francisco Partners Discloses App Users' Personally Identifiable Information To Braze For The Purpose Of Marketing, Advertising, And Website Analytics.................. 30

V. DEFENDANTS KNOWINGLY DISCLOSE CONSUMERS' PII TO THE THIRD PARTIES .......................................................................................... 33

CLASS ALLEGATIONS .......................................................................................... 34

CAUSES OF ACTION .......................................................................................... 36

VIOLATION OF THE VPPA – IBM CLASS .......................................................... 36

VIOLATION OF THE VPPA – FRANISCO PARTNERS CLASS ............................... 39

UNJUST ENRICHMENT .......................................................................................... 42

PRAYER FOR RELIEF .......................................................................................... 44

JURY TRIAL DEMANDED .......................................................................................... 44

Plaintiff John Castillo ("Plaintiff"), individually and behalf of all others similarly situated, brings this class action against Defendants The International Business Machines Corporation ("IBM") and Francisco Partners Management, L.P. ("Francisco Partners") (collectively, "Defendants"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action suit brought against Defendants for violating the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA") and committing unjust enrichment.

2. Defendant IBM owned and operated The Weather Channel website, weather.com (the "Website"), and mobile application (the "App") (collectively, the "Weather Channel Video Service"), which provide pre-recorded video content for weather-related news stories.

3. In August 2023, Defendant IBM announced the sale of the Weather Channel Video Service to Defendant Francisco Partners. That sale was completed in February 2024, at which time Defendant Francisco Partners formally acquired the Weather Channel Video Service.[1] As of that date, Defendant Francisco Partners has owned and operated the Weather Channel Video Service.

4. Unbeknownst to Plaintiff and Class Members, Defendant IBM knowingly and willfully disclosed its users' personally identifiable information—including a record of every video viewed by the user—to unrelated third parties, including but not limited to mParticle and

[1] Francisco Partners Completes Acquisition of The Weather Company (Feb. 1, 2024), https://www.franciscopartners.com/media/francisco-partners-completes-acquisition-of-the-weather-company.

Microsoft through its "Microsoft Invest" platform.[2]

5. Likewise, unbeknownst to Plaintiff and Class Members, Defendant Francisco Partners knowingly and willfully disclosed its users' personally identifiable information—including a record of every video viewed by the user—to unrelated third parties, including but not limited to mParticle and Braze.

6. Microsoft, Braze, and mParticle shall be collectively referred to as the "Third Parties."

7. Plaintiff has used both The Weather Channel Website and iOS App to watch pre-recorded videos when the Weather Channel Video Service was owned by Defendant IBM, and when the Weather Channel Video Service was owned by Defendant Francisco Partners. Whenever Plaintiff watched a pre-recorded video, Defendant IBM (before February 2024) and Defendant Francisco Partners (since February 2024) disclosed Plaintiff's video-viewing information and personally identifying information ("PII") to third parties.

8. Plaintiff brings this action for damages and other legal and equitable remedies resulting from Defendant's violations of the VPPA and unjust enrichment.

## THE PARTIES

9. Plaintiff John Castillo is a resident of New Jersey and has an intent to remain there and is therefore a citizen of New Jersey. In or about May 2022, Mr. Castillo created a Weather Channel Video Service account, which allowed him to save his favorite weather locations and forecast preferences and set up his own weather dashboard. Mr. Castillo also downloaded The Weather Channel App and later purchased a Weather Channel premium account in 2024, which

[2] "Microsoft Invest" was formerly known as "Xandr" and "AdNexus" before it was acquired and rebranded by Microsoft. Thus, all references in this Complaint to "Xandr" or "AdNexus" should be construed as references to "Microsoft" or "Microsoft Invest," except where indicated otherwise.

inured benefits like more precise and elongated forecasts.

10. Since May 2022, Mr. Castillo has watched pre-recorded videos on The Weather Channel Website and iOS App while signed into his Weather Channel Video Service account.

11. As alleged in more detail below, and unbeknownst to Mr. Castillo, whenever Mr. Castillo watched a pre-recorded video on the Website prior to February 2024, Mr. Castillo's first name, gender, e-mail address, approximate geolocation, the name of the videos he watched, and the URLs of videos he watched—which listed the name of the video—were disclosed by Defendant IBM to third parties, mParticle and Microsoft.

12. Also as alleged in more detail below, and unbeknownst to Mr. Castillo, whenever Mr. Castillo watched a pre-recorded video on the Website since February 2024, Mr. Castillo's first name, gender, approximate geolocation, the name of the videos he watched, and the URLs of videos he watched—which listed the name of the video—were disclosed by Defendant Francisco Partners to mParticle.

13. Finally, as alleged in more detail below, and unbeknownst to Mr. Castillo, whenever Mr. Castillo watched a pre-recorded video on the iOS App since February 2024, Mr. Castillo's first name, e-mail address, gender, precise geolocation, and the name of the videos he watched were disclosed by Defendant Francisco Partners to mParticle and Braze.

14. Using the information they acquired through the disclosure of Mr. Castillo's PII, mParticle, Microsoft, and Braze were able to analyze and track Mr. Castillo's activity across the Website, target Mr. Castillo with relevant advertising and marketing, and assist Defendant with revenue generation by factoring Mr. Castillo's PII into a real-time bidding process.

15. At all relevant times, Mr. Castillo was unaware that his PII were disclosed to mParticle, Microsoft, and Braze, nor did Mr. Castillo consent to the same.

16. Mr. Castillo never consented, agreed, nor otherwise permitted Defendants to disclose his personally identifying information to third parties, and certainly did not do so for purposes violative of the VPPA.

17. Likewise, Defendants never gave Mr. Castillo the opportunity to prevent the disclosure of his PII by third parties.

18. Defendant IBM is a New York company with its principal place of business at 1 New Orchard Road, Armonk, NY 10504. Defendant IBM owned and operated the Weather Channel Video Service prior to February 2024.

19. Defendant Francisco Partners is a Delaware company with its principal place of business at 1 Letterman Drive, Building C Suite 410, San Francisco, California 94129. Defendant Francisco Partners also maintains an office in New York City. Defendant Francisco Partners has owned and operated the Weather Channel Video Service since February 2024.

## JURISDICTION AND VENUE

20. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the VPPA is a federal statute.

21. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and at least one member of the proposed class is citizen of state different from at least one Defendant.

22. Defendant Francisco Partners is an "unincorporated association" pursuant to 28 U.S.C. § 1332(d)(10) and is therefore "a citizen of the State where it has its principal place of business [California] and the State under whose laws it is organized [Delaware]."

23. This Court has general personal jurisdiction over Defendant IBM because

Defendant IBM maintains its principal place of business in New York. This Court also has specific personal jurisdiction over Defendant Francisco Partners because Defendant Francisco Partners conducts substantial business in New York, including but not limited to operation of the Weather Channel Video Service, such that it has purposefully availed itself of the privilege of doing business in New York, and Plaintiff's claims are related to that conduct.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District.

## STATEMENT OF FACTS

### I. DEFENDANTS ARE VIDEO TAPE SERVICE PROVIDER, AND CONSUMERS WITH ACCOUNTS ARE SUBSCRIBERS

25. Defendant IBM is one of the largest technology companies in the world, while Defendant Francisco Partners is a private equity firm focused exclusively on investments in technology and technology-enabled services businesses.

26. One of Defendants' ventures is the Weather Channel Video Service, which prides itself on being "America's #1 Weather Network" with a "daily focus on climate news and best-in-class severe weather coverage."[3] In more recent years, The Weather Channel has also focused on providing more entertainment-based ventures, such as *Wake Up With Al [Roker]*.

27. As noted above, the Weather Channel Video Service was owned and operated by Defendant IBM until approximately February 2024, at which time it was formally acquired—and thus, owned and operated—by Defendant Francsico Partners.

28. The Weather Channel Website was visited over 840 million times in September 2024 alone.[4] The Weather Channel iOS App had 200,000 downloads in just November 2024

[3] https://www.weathergroup.com/brands/the-weather-channel.

[4] https://www.similarweb.com/website/weather.com/#overview.

alone, with $1 million in revenue that same month.[5]

29. While The Weather Channel television network provides live broadcasts, the Website focuses on the provision of pre-recorded, weather-related content. This content can be found under a "Video" tab on the Website:




30. Likewise, the Weather Channel iOS App contains a tab specifically for video content, which is currently labeled "Winter" for seasonal purposes in the below screenshot. Upon clicking the tab, users will be directed to a playlist of pre-recorded video content by category:

//

//

//

[5] https://app.sensortower.com/ios/publisher/the-weather-channel-interactive/295646464.




31. Through their operation of the Weather Channel Video Service, Defendants are "video tape service providers," 18 U.S.C. § 2710(a)(4), because the provision of pre-recorded video content is "a focus of the [D]efendant[s'] work." *In re Vizio, Inc., Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017).

32. Although videos on the Weather Channel Video Service are free to watch, consumers can create an account on the Weather Channel Video Service. In exchange for providing Defendants (but not third parties) with their PII, consumers receive certain benefits such

as "sav[ing] your favorite locations and forecast preferences across devices, and set[ting] up your own weather dashboard." Consumers can also purchase a Weather Channel premium subscription, which provides extended and more detailed forecasts. Finally, consumers can download the Weather Channel App in addition to visiting the Website.

33. Consumers' PII carries immense value to Defendants. This is because "[c]ompanies can purchase advertising space on [] sites [like Defendant's] in an effort to reach consumers they might otherwise miss."[6] Indeed, as studies have found:

> [t]oday, digital content is largely funded by advertising, which means that companies monetize our behavior, attention, and [personal data] rather than us paying for services with money. To maximize revenue, advertising services heavily rely on continuous data collection and tracking [personal data] from users.[7]

34. Defendants generate immense profit from other companies bidding to show advertisements to Defendants' users. And the more identifying information is, the more valuable Defendants' consumers are (*i.e.*, the more companies are willing to pay to show advertisements to Defendants' consumers), because businesses will "pay for greater exposure to their intended audience through … targeted messages to specific consumer groups" or to "tailor their marketing campaigns to a specific set of online prospects."[8]

35. Defendants also profit indirectly from consumer information because this information "helps a business understand how well a product or service is received by its

---

[6] HOW DO INTERNET COMPANIES PROFIT WITH FREE SERVICES?, INVESTOPEDIA, https://www.investopedia.com/ask/answers/040215/how-do-internet-companies-profit-if-they-give-away-their-services-free.asp.

[7] Trung Tin Nguyen et al., *Share First, Ask Later (or Never?) Studying Violations of GDPR's Explicit Consent in Android Apps*, 30TH USENIX SECURITY SYMPOSIUM 3667, 3679 (2021), https://www.usenix.org/system/files/sec21-nguyen.pdf.

[8] *Id.*

consumers, what specific products certain consumers may be interested in, and how well the business is presenting its marketing message. Each of these aspects makes the data collected from free content sites incredibly valuable to e-commerce companies."[9]

36. Companies are willing to trade money or services for information because companies profit immensely from consumer information. For instance, Meta (formerly known as Facebook) "earned about $9.45 per user in the third quarter of 2022."[10] For reference, "about 3.59 billion people" were "active on at least one Meta platform" in 2022.[11]

37. Thus, Weather Channel Video Service users become "consumers" or "subscribers" of Defendants' in at least two ways. *First*, consumers who create a Weather Channel Video Service account subscribe to the Weather Channel Video Service—the medium through which Defendants provide pre-recorded video content—and receive various, account-exclusive benefits in exchange for providing their PII to Defendants. *See Salazar v. National Basketball Association*, 118 F.4th 533, 546-552 (2d Cir. 2024). *Second*, consumers can purchase a Weather Channel premium account and receive more benefits in exchange for money. And *third*, consumers can download the Weather Channel App and access pre-recorded videos through the same as well. *Golden v. NBCUniversal Media, LLC*, 2024 WL 4904676, at *2 n.2 (S.D.N.Y. Nov. 27, 2024) ("Given the [Second] Circuit's conclusion that the exchange of personal information for access demonstrates, at the pleading stage, that one is a 'subscriber' under the VPPA, a mobile application would appear similarly to plead a 'subscriber' relationship.").

---

[9] *Id.*

[10] *Id.*

[11] Daniel Shvartsman, *Facebook: The Leading Social Platform of Our Times*, INVESTING.COM (Aug. 21, 2024), https://www.investing.com/academy/statistics/facebook-meta-facts/.

## II. DEFENDANTS KNOWINGLY DISCLOSE CONSUMERS' PERSONALLY IDENTIFIABLE INFORMATION TO THIRD PARTIES

### A. Testing Revealed That Defendant IBM Illegally Disclosed Its' Consumers' PII With Third Parties

38. In Summer 2023, Plaintiff's counsel retained a private research company to review the Weather Channel Website and conduct a dynamic analysis. A "dynamic analysis" records the transmissions that occur from a user's device or web browser.

39. The researchers tested what information (if any) was disclosed when a user visits the Website and watches a pre-recorded video or takes other actions (*e.g.*, clicking on various menu options). The analysis revealed Defendant IBM disclosed information to third parties sufficient to identify specific Class Members and the specific videos they watched.

40. The analysis first established that multiple "software development kits" ("SDKs") and "application programming interfaces" ("APIs") are incorporated into the Weather Channel Video Service.

41. SDKs are "set[s] of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For example, Google Analytics provides an SDK that gives insight into user behavior, engagement, and cross-network attribution."[12]

42. APIs "enable[] companies to open up their applications' data and functionality to external third-party developers, business partners, and internal departments within their companies."[13] APIs "act[] an intermediary layer that processes data transfer between systems, letting companies open their application data and functionality to external third-party developers

---

[12] *API vs. SDK: The Difference Explained*, GETSTREAM, https://getstream.io/glossary/api-vs-sdk/.

[13] APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

[and] business partners."[14] APIs can "work[] as a standalone solution or included within an SDK … [A]n SDK often contains at least one API."[15]

43. Crucially, these third party APIs and SDKs are run and administered by the third parties themselves, rather than being tools through which Defendants record their own data.

44. As relevant here, Defendant IBM disclosed to mParticle[16] and Microsoft (through Microsoft Invest)[17] the PII of Weather Channel Website users through their respect SDKs and APIs.

45. mParticle is "one of the leading customer data platforms, serving hundreds of global brands and helping them turn data to insights, and insights to action."[18] At a high level, mParticle uses the information it receives to, among other things, provide "real-time personalization and targeting," provide "predictive," "AI-powered insights … on each customer profile that inform how to preempt churn, improve return on ad spend, and more."[19]

46. Microsoft Invest, formerly known as "Xandr" and "AdNexus," is a premium advertising platform.[20] At a high level, Microsoft Invest uses the information it receives to, among

---

[14] *What Is An API?*, IBM, https://www.ibm.com/topics/api.

[15] *SDK vs. API: What's the Difference?*, IBM (July 13, 2011), https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface).

[16] https://www.mparticle.com/

[17] https://about.ads.microsoft.com/en-us/solutions/xandr/xandr-premium-programmatic-advertising

[18] https://www.mparticle.com/about-us/

[19] https://www.mparticle.com/solutions/real-time-personalization-targeting/.

[20] https://about.ads.microsoft.com/en-us/solutions/xandr/xandr-premium-programmatic-advertising

other things, "help advertisers engage with audiences using … digital video,"[21] analyze the effectiveness of advertising campaigns,[22] and "monetize proprietary data."[23]

47. The dynamic analysis found that when a user viewed a pre-recorded video on the Website, Defendant IBM disclosed to these third parties information sufficient to permit an ordinary person to identify a specific person's video-viewing behavior. Specifically, when a user created a Weather Channel Video Service account and viewed a pre-recorded video on the Website, the following PII was disclosed to mParticle and Microsoft:

| THIRD PARTY | VIDEO INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| mParticle | Name, URL | geolocation, email, gender, name | |
| AdNexus | Name | geolocation, email, gender, name | AAID |

**B. Testing Revealed That Defendant Francisco Partners Illegally Discloses Its' Consumers' PII With Third Parties**

48. In November 2024, to account for the change in ownership of the Weather Channel Video Service, Plaintiff's counsel asked the same private research company to review the Weather Channel Website and App and conduct a dynamic analysis.

---

[21] https://about.ads.microsoft.com/en-us/solutions/xandr/advertiser-platform-invest-dsp-premium-content.

[22] *Id.*

[23] https://about.ads.microsoft.com/en-us/solutions/xandr/curation-platform-self-serve-monetization-solution

49. The dynamic analysis found that Defendant Francisco Partners still discloses Website users' PII to mParticle, although Defendant Francisco Partners no longer discloses Website users' e-mail addresses to mParticle:




50. However, the dynamic analysis now found that Defendant Francisco Partners also discloses iOS App users' PII to third parties, including but not limited to mParticle and Braze.

51. Braze is a "customer engagement platform" that "power[s] customer-centric interactions between consumers and brands in real-time."[24] At a high level, Braze uses the information it receives to, among other things, analyze app data in real time and conduct real-time targeted marketing campaigns[25] and send personalized push notifications and in-app messages to mobile users.[26]

52. The dynamic analysis found that when an account user watches a pre-recorded video on the iOS App, Defendant Francisco Partners discloses to both Braze and mParticle that users': (i) first name; (ii) precise geolocation; and (iii) the name of the pre-recorded video watched by the user. Defendant also disclose to mParticle the iOS App users' e-mail address, gender, and

---

[24] BRAZE, https://www.braze.com/.

[25] DATA & ANALYTICS, https://www.braze.com/product/data-and-analytics.

[26] MOBILE & WEB PUSH, https://www.braze.com/product/mobile-web-push; IN-APP & IN-BROWSER MESSAGING, https://www.braze.com/product/in-app-in-browser-messages.

Identifier for Vendors ("IDFV"):

| THIRD PARTY | VIDEO INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| **Braze** | Video Name, Video ID | Geolocation, City, Zip Code, Name | User ID |
| **mParticle** | Video Name, Video ID | Geolocation, City, Zip Code, Name, Email, Gender | User ID, IDFV |

## III. THE INFORMATION DEFENDANTS DISCLOSED TO THE THIRD PARTIES CONSTITUTES PERSONALLY IDENTIFIABLE INFORMATION

53. The VPPA prohibits the "knowing[] diclos[ure]" by a "video tape service provider" of the "personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). "[T]he term 'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provide." 18 U.S.C. § 2710(a)(3). Thus, to be liable under the VPPA, the third party must receive information sufficient to identify a particular user. As alleged below, the information Defendants disclosed to mParticle, Microsoft, and Braze fit the bill.

### A. Defendants Disclose Consumers' E-Mail Addresses To mParticle And Microsoft

54. An email address is a unique string of characters which designate an electronic mailbox. As industry leaders,[27] trade groups,[28] and courts agree,[29] an ordinary person can use an

[27] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[28] NETWORK ADVERTISING INITIATIVE, NAI CODE OF CONDUCT 19 (2019), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[29] *See*, *e.g.*, *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual.").

email address to uniquely identify another individual. Indeed, there exists multiple services that enable anyone with internet access and a credit card to look up who owns a particular email address,[30] and social media also allows for the identification of users via e-mail address.[31]

55. mParticle also admits an "email address is more likely to be unique to a single user than [some other identifiers]."[32]

56. As the dynamic analyses establish, when a Weather Channel Video Service user with an account watches a pre-recorded video on the Website, Defendant IBM disclosed the user's e-mail addresses to mParticle and Microsoft, along with the user's first name.

57. Similarly, as the dynamic analyses establish, when a Weather Channel Video Service user with an account watches a pre-recorded video on the iOS App, Defendant Francisco Partners discloses the user's e-mail addresses to mParticle, along with the users' first name.

**B. Defendants Disclose Consumers' Geolocation To The Third Parties**

58. Geolocation is "the identification of the real-world geographic location of an object."[33] Geolocation identifies an object by "generating a set of geographic coordinates such a

---

[30] *See*, *e.g.*, www.beenverified.com; www.thatsthem.com; www.newber.com, www.whitepages.com; www.truepeoplesearch.com; www.instantcheckmate.com.

[31] Balachander Krishnamurthy & Craig E. Wills, On the leakage of personally identifiable information via online

social networks." In *Proceedings of the 2nd ACM workshop on Online social networks*, pp. 7-12. 2009.

172 Bilge, Leyla, Thorsten Strufe, Davide Balzarotti, and Engin Kirda. "All your contacts are belong to us: automated

identity theft attacks on social networks." In *Proceedings of the 18th international conference on World wide web*,

pp. 551-560. 2009.

[32] https://docs.mparticle.com/guides/idsync/identify-users/

[33] WHAT IS GEOLOCATION?, https://www.indicative.com/resource/geolocation/.

latitude and longitude through GPS and using the coordinates to determine a meaningful location."[34]

59. Geolocation is considered precise when it provides street level accuracy. Precise geolocation can be used by anyone to uniquely identify a person. A study in 2013, for example, analyzed mobility data for 1.5 million people, finding that researchers needed only four randomly chosen spatio-temporal points (points that represent the time and location of a specific event, such as watching a video) to uniquely identify 95% of the people (approximately 1.425 million out of 1.5 million) in the dataset.[35]

60. This information may also be used to track consumers to sensitive locations, including places of religious worship, places that may be used to infer an LGBTQ+ identification, domestic abuse shelters, medical facilities, and welfare and homeless shelters.

61. By plotting the latitude and longitude coordinates including geolocation data using publicly available map programs, it is possible to identify which consumers' mobile devices visited reproductive health clinics. Similar methods may be used to trace consumers' visits to other sensitive locations.

62. As Paul Ohm, a law professor and privacy researcher at Georgetown University Law Center, explains it: "[r]eally precise, longitudinal geolocation information is absolutely

---

[34] WHAT IS GEOLOCATION?, https://www.indicative.com/resource/geolocation/.

[35] Yves-Alexandre de Montjaye, et al., *Unique in the Crowd: The privacy bounds of human mobility*, SCIENTIFIC REPORTS 2 (Feb. 4, 2013), https://www.nature.com/articles/srep01376.

impossible to anonymize."[36] In fact, out of all identifiers, "D.N.A. is probably the only thing that's harder to anonymize than precise geolocation information."[37]

63. Here, Defendant IBM disclosed Website users' geolocation to mParticle and Microsoft with at least two decimal places of accuracy, and Defendant Francisco Partners disclosed App users' geolocation to mParticle and Braze with at least three decimal places of accuracy.

64. By disclosing users' geolocation data to third parties, and by procuring third parties to collect geolocation, Defendant discloses to third parties information that an ordinary person could use to identify Defendant's users.[38]

65. Companies collect and disclose geolocation so they can maximize their advertising revenue. As a *New York Times* article explained: "For brands, following someone's precise movement is key to understanding the 'customer's journey'—every step of the process from seeing an ad to buying a product."

66. Marketers consider geolocation "the Holy Grail of advertising" because it creates "the complete picture that connects all of our interests and online activity with our real-world actions."[39]

67. Defendants' conduct is self-serving, as the Third Parties use the geolocation they receive to enhance Defendants' marketing efforts, advertising, and Website and App analytics.

---

[36] Stuart A. Thompson & Charlie Warzel, *Twelve Million Phones, One Dataset, Zero Privacy* N.Y. TIMES (Dec. 19, 2019), https://www.nytimes.com/interactive/2019/12/19/opinion/location-tracking-cell-phone.html.

[37] *Id.*

[38] *See Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016).

[39] *Id.*

### C. Defendants Disclose Consumers' Video-Viewing Information To The Third Parties

68. As alleged above, Defendants disclose the full names of the pre-recorded videos watched by Website and App users to the Third Parties.

69. Specifically, Defendant IBM disclosed the full title and URL of the pre-recorded videos watched by Website users to mParticle and Microsoft, and Defendant Franisco Partners discloses the same information for Website users to mParticle. The URL discloses the exact name of the pre-recorded video, as indicated by the following snippet of Website traffic from the analysis of the disclosure to mParticle:


```
"url": "/news/weather/video/extreme-heat-can-cause-roads-to-buckle-blow-out",
"deviceClass": "desktop",
"referrer": "https://weather.com/",
"wlocCity": "Santa Clara",
"wlocState": "CA",
"wlocCountry": "US",
"hourOfDay": 13,
"dayOfWeek": "FRI",
"productId": "f787ccbd-3e25-4103-88f0-6423de1fe92f",   * potential video IDs
"contentId": "a534d5b5-d874-4edb-81d9-bd0b40c39bde",
"duration": "00:25",
"teaserTitle": "Roads Buckling Under Extreme Heat",
"collection": "news/weather",
"playLists": "['pl-breaking-news','pl-wunderground-top-stories','pl-weather-explained-Topic','pl-the-latest','pl-samsung']",
"title": "Extreme Heat Can Cause Roads To Buckle, Blow Out",
```


70. Similarly, Defendant Francisco Partners discloses the full title of the pre-recorded videos watched by iOS App users to mPartciela and Braze.

71. The transmission of this video information occurs when a user actually watches the specific pre-recorded video, and not simply because a user visits a page with a video and does not watch the video, or visits a page with many videos and the information does not indicate which video is watched.

72. *First*, both mParticle and Microsoft receive the *full name* of the video, not just the URL. Thus, it is clear from that transmission the title of the video watched by the user, not just that a user visited a page with a video.

73. *Second*, the transmissions to mParticle and Microsoft indicate that a video was indeed watched. For instance, for the Summer 2023 analysis, the mParticle transmission specifically includes the value "'event name' : 'video started'," as well as the time when that video was watched:


```
"data": {
  "event_name": "video-started",
  "timestamp_unixtime_ms": 1692994139011,
  "session_start_unixtime_ms": 1692992931667,
  "custom_attributes": {
    "pageKey": "video",
    "url": "/news/weather/video/extreme-heat-can-cause-roads-to-buckle-blow-out",
```


74. The time stamp value is a Unix Timestamp, which "is a way to track time as a running total of seconds. This count starts at the Unix Epoch on January 1st, 1970 at UTC. Therefore, the unix time stamp is merely the number of seconds between a particular date and the Unix Epoch."[40] The time stamp here—1692994139011—is August 25, 2023 at 4:08:59 p.m. Eastern Time.[41]

75. The November 2024 analysis confirms mParticle continues to receive this information, including event types (in the below snippet, "video played,"), the Unix timestap, and the fact that the page being viewed is a "video":


```
PostData:
source_request_id: 98570a70-a9e4-491c-25ad-f6ade4b09c0e
  mpid: 1080357209362860562
  timestamp_unixtime_ms: 1731532986111
  environment: production
  events: {
    … {'event_type': 'custom_event', 'data': {'custom_event_type': 'other', 'custom_flags':
{}, 'event_name': 'video-played', 'timestamp_unixtime_ms': 1731532976766, 'session_uuid':
'5CBF61B4-F2F8-47F8-B3EF-C5CDC6769270', 'session_start_unixtime_ms': 1731532743096,
'custom_attributes': {'title': 'Here's How To Protect Yourself From Wildfire Smoke',
'locale': 'en-US', 'url': '/safety/wildfires/video/wildfire-smoke-safety-tips', 'pageCode':
'video', 'collectionId': 'safety/wildfires', 'adBlock': False, 'muted': False, 'fromString':
```


[40] THE CURRENT EPOCH UNIX TIMESTAMP, https://www.unixtimestamp.com/.

[41] *Id.*

76. Similarly, for Microsoft, the network traffic from the Summer 2023 analysis shows the value, "'event_name' : 'module-viewed'," being transmitted, where "module" refers to the video watched. This is clear from the value, "'moduleTitle,'" which is the name of the video:


```
"data": {
    "custom_event_type": "other",
    "event_name": "module-viewed",
    "custom_attributes": {
        "moduleId": "WxuContentMedia-sidebar-bd88006a-fed4-498d-8241-e7c6050fac3f",
        "moduleTitle": "Watch Pavement Blow Out",
```


77. For App users, the November 2024 dynamic analysis revealed similar information was being disclosed to Braze and mParticle. Braze receives event data (in the below example, "video played"), the "video start method," the fact the content being viewed is a video, and how much of the video was watched:


```
"data": {
"n": "video-played",
"p": {
…
"aspectRatio": "horizontal",
"collection": "news/weather",
"contentId": "7ecb08ca-6650-4b66-b75a-e1e953b87f36",
"contentStarted": "true",
"dayOfWeek": "Thu",
…
"pageId": "video",
"physicalState": "NY",
"pillPlayed": "Trending Today",
"providerName": "TWC",
"regime": "USA",
"segmentViewed": "75%-100%",
"sessionId": "94B6A268-C60F-4254-A7B1-566668421540",
"sourcePage": "home-today",
"teaserTitle": "Huge Haboob Causes Chaos In Central California",
"title": "Enormous Dust Storm Cuts Power, Blinds Drivers In California",
"videoExitReason": "user clicked another video",
"videoSource": "home-today",
"videoStartMethod": "click",
```


78. Likewise, on the iOS App, mParticle receives the fact that the content being viewed is a video and how many videos have been viewed by the user:

```
"an": "The Weather Channel",
…
"sessionId": "94b6a268-c60f-4254-a7b1-566668421540",
"sessionStartTime": "1731585027549",
"wlocCity": "sheffield",
"wlocCountry": "us",
"wlocDMA": "532",
"wlocState": "ma"
…
"pageId": "video",
"sessionId": "94b6a268-c60f-4254-a7b1-566668421540",
"sessionStartTime": "1731585027549",
"tagsStorm": [],
"teaserTitle": "huge haboob causes chaos in central california",
"title": "enormous dust storm cuts power, blinds drivers in california",
"videoLength": "35",
"videoPlayCount": "2",
"videoSource": "home-today",
"videoStartMethod": "home-today"
```


79. Thus, the Third Parties not only receive and collect what specific video a user watches, but also that the user in fact watched a specific video.

80. Crucially, the Third Parties are able to link consumers' identity information (*e.g.*, names, e-mail addresses, geolocation) with their video-viewing information because (i) all of the information is sent to the Third Parties in a single transmissions; and/or (ii) all of the information is linked together through other, consumer-specific identifiers like a "session ID" or an ID specific to the Third Party (*e.g.*, a "Braze ID" or an "mParticle ID").

81. Indeed, the Third Parties are able to link information disclosed to each of them individually *together* through the use of such identifiers. For instance, the dynamic analysis found the same session ID for the App user was disclosed to both Braze and mParticle, meaning these two Third Parties understand the same users' PII is being disclosed to both of them and can link that information together to bolster their individual disclosures:


```
"sessionId": "94B6A268-C60F-4254-A7B1-566668421540",
"sourcePage": "home-today",
"teaserTitle": "Huge Haboob Causes Chaos In Central Ca
"title": "Enormous Dust Storm Cuts Power, Blinds Drive
```


**Transmission To Braze**

```
"sessionId": "94b6a268-c60f-4254-a7b1-566668421540",
"sessionStartTime": "1731585027549",
"wlocCity": "sheffield",
```


**Transmission to mParticle**

## IV. DEFENDANTS DISCLOSE CONSUMERS' PII TO THE THIRD PARTIES FOR THE PURPOSE OF MARKETING, ADVERTISING, AND ANALYTICS

82. Defendants disclose PII to the Third Parties so the Third Parties can help Defendants with marketing, advertising, and analytics.

83. As alleged above, the Third Parties are designed to analyze user information, conduct targeted marketing and advertising, and ultimately boost Defendants' revenue from its video-based marketing and advertising on the Weather Channel Video Service.

### A. Defendants Disclose Personally Identifiable Information To mParticle For The Purpose Of Marketing, Advertising, And Analytics

84. As alleged above, mParticle describes itself as a "as one of the leading customer data platforms, serving hundreds of global brands and helping them turn data to insights, and insights to action."[42]

85. One of mParticle's key features is "IDSync," "[t]he primary purpose of [which] is to ensure that you are attributing data to the correct user, *which requires you to successfully identify the current user of your app or website*."[43]

86. mParticle notes that "*[a]s soon as the user opens your app [or website]*, an identity request is automatically made to mParticle to look for a matching user profile."[44] mParticle also

[42] https://www.mparticle.com/about-us/.

[43] https://docs.mparticle.com/guides/idsync/identify-users/ (emphasis added).

[44] *Id.* (emphasis added).

admits that it receives "the username or email address provided when the user signs up," and uses that information to track users.[45]

87. Crucially, the default configuration for mParticle is only to collect a user's "customer ID."[46] Therefore, Defendants had to knowingly and willfully allow mParticle to receive and collect e-mail addresses and geolocation data because otherwise, mParticle would only be receiving and collecting customer IDs.

88. Once a user has been identified, their actions are tracked across a website or app like Defendants', that "event data" is used to measure website performance and statistics. Website and app developers like Defendants can configure mParticle to receive "custom event" data, which covers a wide assortment of activity on a website.[47]

89. Ironically, the example for "custom event data" mParticle lists in its developer documentation is "Videos Watched":

**Capture a Custom Event**

You can quickly log a simple event as follows:

```
mParticle.logEvent(
  'Video Watched',
  mParticle.EventType.Navigation,
  {'category':'Destination Intro','title':'Paris'}
);
```

[45] *Id.*

[46] https://docs.mparticle.com/guides/idsync/default-strategy/

[47] https://docs.mparticle.com/developers/sdk/web/event-tracking/

90. mParticle also allows website and app developers like Defendants to "track the location of your users."[48] Again, this is an optional feature, meaning Defendants had to knowingly and willfully allow mParticle to receive and collect geolocation data.

91. With all of this event and location data, mParticle, ironically again, shows website and app developers like Defendants how they can violate the VPPA. In mParticle's developer documentation, it includes the following tutorial:

> The mPTravel app lets users watch video content about travel destinations. This tutorial creates an audience to allow mPTravel to *target users who view content about a particular destination with deals for that destination*.[49]

92. *First*, mParticle would record the "event data'" for whoever watched a specific video.[50] *Second*, mParticle can include in its "Audience" whoever clicks on and watches that specific video, as well as other attributes like subscription status, geolocation, or any attribute the website developer wants to send or have mParticle collect:[51]




[48] https://docs.mparticle.com/developers/sdk/web/location/

[49] https://docs.mparticle.com/guides/getting-started/create-an-audience/ (emphasis added).

[50] https://docs.mparticle.com/guides/getting-started/create-an-audience/

[51] *Id.*

93. *Third*, once a website developer "activates" this "audience," mParticle will begin receiving, collecting, and measuring data that matches the criteria listed above. So, as applied to Defendant's Website, Defendant might create an "audience" of users who watched a specific video from a specific location, and mParticle would receive and collect that data (as well as users' names and e-mail addresses).

94. *Fourth*, after receiving sufficient information, mParticle can forward the "audience" to another third party to conduct marketing. So, in the above example, mParticle could forward the contact information for all "audience" members to Mailchimp, who would send targeted e-mail advertising to users based on the specific video they watched.[52]

95. All of this is to benefit website developers like Defendants, who send data to mParticle to drive website traffic, conduct targeted marketed campaigns using detailed user data, and increase revenue (*e.g.*, through incentivizing users to purchase products on a website through targeted advertising).

96. The receipt and collection of this user data also allows mParticle to identify users and build sophisticated user profiles, encompassing everything from a user's name and location to age range and gender[53]:

[52] https://docs.mparticle.com/guides/getting-started/connect-an-audience-output/.

[53] https://www.mparticle.com/platform/detail/profile-api/




97. Defendants use (or used in the case of IBM) each and every one of the above-mentioned features of mParticle, among others, on the Weather Channel Video Service. Thus, Defendants disclose information to mParticle to perform extensive analytics, conduct targeted marketing campaigns, and improve Website and App performance—all of which, in turn, generates greater revenue for Defendant.

### B. Defendant IBM Disclosed Website Users' Personally Identifiable Information To Microsoft For The Purpose Of Marketing, Advertising, And Website Analytics

98. As alleged above, "Microsoft Invest"—formerly known as "Xandr" and "AdNexus"—is a premium advertising platform that is part of the suite of internet advertising services offered by Microsoft.[54]

[54] https://about.ads.microsoft.com/en-us/solutions/xandr/xandr-premium-programmatic-advertising

99. In particular:

> The Microsoft Advertising platform is a real-time bidding system and ad server. The main processing system is called the "impression bus." The impression bus receives ad requests, applies data to the request, receives bids, makes decisions, serves creatives, logs auctions, etc.
>
> Ad calls come in via our inventory supply partners: exchanges, SSPs, ad networks, and a few valued publishers.
>
> …
>
> Once we get the call, we overlay segment data from our server-side cookie store. Data is added to the cookie store either through Xandr segment pixels or by clients sending us a file of data. We also contact third-party data providers and overlay any available data.
>
> We contact all of the bidders on our platform. The ad call includes whatever user data belongs to each bidder, and information about the inventory. Bidders have a certain number of milliseconds in which to respond with a bid and the creative they want to serve.
>
> …
>
> The impression bus decides which bid wins based on the amount of the bid, and any preferences the publisher has about what they want served on their page. If the call was client-side, Microsoft Advertising serves the ad. If it was server-side, Microsoft Advertising passes the bid and the location of the creative to the partner who will ultimately serve the ad. [55]

100. To break this down, "real-time bidding" or "RTB" is the process through which advertisers and marketers "buy[] and sell[] ads in real time" to website and mobile users. After receiving relevant user data, "multiple advertisers [] bid on a single impression of a publisher's inventory, then the winning ad (with the highest bid) is shown to the user."[56] As an example:

[55] https://learn.microsoft.com/en-us/xandr/invest/about-invest

[56] https://www.adjust.com/glossary/real-time-bidding/

> [t]ake … the moment in a mobile game where the player watches an ad between game levels. At that moment, the mobile [supply-side platform or SSP] runs an auction for all of the advertisers interested in showing an ad to that player. The advertisers make their bid and, in a split-second, the highest bidder is chosen. Their advertisement is then served to the player.[57]

101. As Microsoft, there are several key players in the RTB process, which include but are not limited to:

> - Publishers (sellers) provide inventory, or the space where ads are displayed. This may be a website or a mobile app.
> - Advertisers or marketers (buyers) purchase inventory for the display of advertisements. For example, Microsoft, Amazon, and Target are all advertisers.
> - Users are the target customers for advertisements.
> - Supply Side Platforms (SSPs) enable publishers to access demand from many different networks, exchanges, and platforms through a single interface. For example, Xandr, Liverail, OpenX, and Pubmatic can act as SSPs.[58]

102. Each of these entities work together to serve targeted advertisements to users in a process called "ad serving." To elaborate, "[a]d serving is the process of determining which advertisement goes in which ad slot on a publisher's webpage or mobile app and then delivering the advertisement."[59]

---

[57] *Id.*

[58] https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving

[59] *Id.*

103. Microsoft Invest is a real-time bidding platform (specifically, a SSP) that facilitates this economy. It provides "targeting, bidding algorithms, multi-currency support, and all the other features of a premium ad server."[60]

104. A website like Defendant IBM's discloses PII to Microsoft to maximize revenue by having advertisers bid on which ads will be shown to website users, and then show those users targeted marketing and advertisements based on the user's personal data.

105. To facilitate the RTB process, however, Microsoft needs to receive and collect an enormous amount of data about website users. For instance, one of Microsoft Invest's features is "Geo Radius Segments." "A geo radius segment is a list of latitude, longitude, and radius data. [A website developer] can use geo radius segments for geographical targeting of multiple user locations."[61]

106. Thus, if a website developer sends geolocation data to Microsoft, Microsoft can create segments of users based on their geolocation. That geolocation data—or users fitting within a certain geolocation-based segment—would then be shown to advertisers, who would use Microsoft's RTB platform to bid on showing advertisements relevant to a user's location to each user.

107. Crucially, "Geo Radius Segments" is an optional feature of Microsoft, meaning Defendant IBM had to knowingly and willfully enable this feature to disclose and procure Microsoft to intercept geolocation data.

[60] https://learn.microsoft.com/en-us/xandr/invest/about-invest

[61] https://learn.microsoft.com/en-us/xandr/monetize/geo-radius-segments

108. Another feature of Microsoft Invest is "video content targeting." Through this feature, Microsoft can target users "based on available detail about the specific video content, including the type of programming, the subject matter, the scheduled airtime, and more."[62]

109. Defendant IBM used each and every one of the above-mentioned features of Microsoft Invest on the Website. Thus, Defendant IBM disclosed information to Microsoft to facilitate real-time bidding, serve targeted advertisements on users based on their PII, and generate greater revenue for Defendant IBM through this process.

### C. Defendant Francisco Partners Discloses App Users' Personally Identifiable Information To Braze For The Purpose Of Marketing, Advertising, And Website Analytics

110. As alleged above, Braze describes itself as a "customer engagement platform" that prides itself on providing "highly personalized, customized experiences" in exchange for customer data,[63] and provides a "marketing automation tools [that] enables brands to drive user engagement and retention through multi-channel campaigns."[64]

111. Braze helps app developers like Defendant market, advertise, and analyze app data and analyze real-time user data in order to build precise audiences that can "[i]dentify, target and engage customers based on their likelihood to purchase or perform any other high value action."[65]

112. The data Braze collects is not just from one source. On the contrary, app developers like Defendant can integrate customer information from a variety of sources into Braze. Using this information, app developers can then utilize Braze's analytics to obtain a "unified view" of

---

[62] https://learn.microsoft.com/en-us/xandr/monetize/video-content-targeting

[63] BRAZE, https://www.braze.com/.

[64] DATA PROCESSING ADDENUM (Aug. 2024), https://cdn.sanity.io/files/b7pblshe/marketing-prod/51c1aa4cc9cf5feaf1c6048fb791e3a741f7e886.pdf.

[65] DATA & ANALYTICS, BRAZE, https://www.braze.com/product/data-and-analytics.

their customers in order to "act on real-time and historical preferences, behaviors, conversion likelihood, and interactions across channels" to target them more effectively. [66]

113. Braze conglomerates all of this data into user profiles, which it associates with identifiers like a Braze user ID and/or e-mail address.[67]




114. As Braze collects more information however, the user profiles become even more detailed. These detailed user profiles could include information related to a user's location, gender, age group, operating system, actions taken on a website, and even if a user has a credit card or not.[68]

---

[66] *Id.*

[67] USER PROFILES, BRAZE, https://www.braze.com/docs/user_guide/engagement_tools/segments/user_profiles/#access-profiles.

[68] *See id.*




115. Notably, all of this information is not disclosed to Braze by default. Instead, Braze only receives information such as user time zone and browser type by default.[69] Rather, app developers like Defendant Francisco Partners must *specifically choose* to disclose additional information such as e-mail addresses and geolocation to Braze.[70]

116. Braze also admits that it "engages third-parties who have access to and process customer personal data."[71] This means Braze *further discloses* any information it acquires to other, unconsented-to third parties. These include, but are not limited to, Amazon and Google.[72]

117. Defendant Francisco Partners uses each and every one of the above-mentioned features of Braze in Defendant Francisco Partners' integration of Braze into the iOS App. Thus,

---

[69] SDK DATA COLLECTION, BRAZE, https://www.braze.com/docs/user_guide/data_and_analytics/user_data_collection/sdk_data_collection/?redirected=true#personalized-integration (last accessed Mar. 19, 2024).

[70] *Id.* ("Personalized Integration; integrators have the flexibility to collect data in addition to Automatically Collected Data.").

[71] BRAZE DATA PROCESSING ADDENDUM FAQS, https://www.braze.com/company/legal/dpa.

[72] BRAZE SUBPROCESSORS, https://www.braze.com/company/legal/subprocessors.

Defendant Francisco Partners discloses PII to Braze to analyze user information, create and analyze the performance of marketing campaigns, and target specific users or specific groups of users for advertisements. All of this helps Defendant Francisco Partners further monetize the App and maximize revenue by collecting and disclosing as much PII as possible to Braze.

## V. DEFENDANTS KNOWINGLY DISCLOSE CONSUMERS' PII TO THE THIRD PARTIES

118. Based on the above, it is abundantly clear that Defendants *knowingly* disclose (or disclosed in IBM's case) their users' personally identifiable information to the Third Parties.

119. Naturally, the Third Parties have access to Weather Channel Video Service user information through Defendants' efforts; the Third Parties do not simply appear on Defendant's Website. Accordingly, Defendants must knowingly and willfully allow the Third Parties to collect the aforementioned user data.

120. Further, Defendants enabled many optional features of the Third Parties' SDKs/APIs that allow the Third Parties to collect optional user information, such as e-mail addresses, geolocation, and video-viewing information.

121. Dispelling any doubt, The Weather Channel, for instance, had its executives appear at conferences and talks with mParticle's CEO[73]:




122. Likewise, mParticle lists "The Weather Channel" as a user of mParticle's "Button" feature, which "provides a way for mobile brands to partner with one another, creating the only simple, scalable, and accurate approach to mobile affiliate acquisition and commerce."[74]

**CLASS ALLEGATIONS**

123. Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), Plaintiff seeks to represent a class of all United States residents who visited Weather.com, created an account, and watched a pre-recorded video on the Website prior to February 1, 2024 while being signed into their account (the "IBM Class").

124. Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), Plaintiff also seeks to represent a

[73] https://www.youtube.com/watch?v=e0PbpWMyRFY

[74] https://www.mparticle.com/blog/button-partnership/

class of all United States residents who visited the Weather Channel Website, created an account, and watched a pre-recorded video on the Website since February 1, 2024 while being signed into their account (the "Francisco Partners Website Class").

125. Finally, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), Plaintiff also seeks to represent a class of all United States residents who downloaded the iOS App, created an account, and watched a pre-recorded video on the iOS App since February 1, 2024 while being signed into their account (the "Francisco Partners App Class").

126. The IBM Class, the Francisco Partners Website Class, and the Francisco Partners App Class shall be collectively referred to as the "Class."

127. Plaintiff reserves the right to modify the class definition as appropriate based on further investigation and discovery obtained in the case.

128. Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands. The precise number of Class Members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants.

129. Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. Common legal and factual questions include, but are not limited to, whether Defendant violated the VPPA and whether Class Members are entitled to actual and/or statutory damages for the aforementioned violations.

130. The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other class members, visited the Website, created an account and elected to receive e-mail updates, and watched a pre-recorded video on the Website.

131. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of Class Members will be fairly and adequately protected by Plaintiff and his counsel.

132. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

133. Plaintiff brings all claims in this action individually and on behalf of members of the Class against Defendant.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE VPPA – IBM CLASS
### 18 U.S.C. § 2710

134. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

135. Plaintiff brings this claim individually and on behalf of the members of the proposed IBM Class against Defendant IBM.

136. At all times relevant to this action, Defendant IBM was a "video tape service provider" as defined by the VPPA because it "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as it provided video (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via the Website. Specifically, Defendant IBM provided pre-recorded, weather-related videos to consumers on the Website.

137. Plaintiff and IBM Class Members are "consumers" as defined by the VPPA because they created Website accounts, through which they provided Defendant IBM (and, without consent, the Third Parties) their PII, which was used to track Plaintiff and IBM Class Members when they viewed pre-recorded video content. 18 U.S.C. § 2710(a)(1). In return for providing their PII, Defendant IBM also provided Plaintiff and IBM Class Members with various benefits exclusive to their accounts. Under the VPPA, therefore, Plaintiff and IBM Class Members are "subscribers" of "goods or services [the Website and/or the Weather Channel accounts themselves] from a video tape service provider." 18 U.S.C. § 2710(a)(1).

138. Plaintiff and IBM Class Members viewed pre-recorded videos on the Website. During each of these occasions, Defendant IBM disclosed Plaintiff's and IBM Class Members' PII. Specifically:

- Plaintiff's and IBM Class Members' (i) first names, (ii) e-mail addresses, (iii) approximate geolocation, (iv) the name of the pre-recorded video watched by Plaintiff and IBM Class Members, and (v) the URL of the pre-recorded video watched by Plaintiff and IBM Class Members, which also contains the name of the video, were disclosed to mParticle.

- Plaintiff's and IBM Class Members' (i) first names, (ii) e-mail addresses, (iii) approximate geolocation, and (iv) the name of the pre-recorded video watched by Plaintiff and IBM Class Members, were disclosed to Microsoft.

139. Defendant IBM's disclosures of Plaintiff's and IBM Class Members' PII to mParticle and Microsoft constituted "knowing[] disclosures" of Plaintiff's and IBM Class Members' "personally identifiable information" to a person as proscribed by the VPPA. 18 U.S.C. § 2710(a)(1).

140. Under the VPPA, the term "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). The information disclosed by Defendant IBM constitutes "personally identifiable information" because it allows an ordinary person to identify Plaintiff and IBM Class Members, as well as which specific videos were watched by Plaintiff and each IBM Class Member.

141. Plaintiff and IBM Class Members did not provide Defendant IBM with consent to disclose their PII to third parties, including mParticle and Microsoft, "in a form distinct and separate from any form setting forth other legal or financial obligations." 18 U.S.C. § 2710(b)(2)(B)(i). Nor were Plaintiff and IBM Class Members given the opportunity to prevent the disclosure of their PII to third parties, including mParticle and Microsoft, "in a form distinct and separate from any form setting forth other legal or financial obligations," and where Plaintiff and IBM Class Members were provided with the "opportunity, in a clear and conspicuous manner … to withdraw on a case-by-case basis or to withdraw from ongoing disclosures." 18 U.S.C. § 2710(b)(2)(B)(iii).

142. Defendant IBM's disclosures were not made in the "ordinary course of business," as the term is defined by the VPPA. In particular, Defendant IBM's disclosures to mParticle and

Microsoft were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

143. On behalf of himself and the IBM Class, Plaintiff seeks: (i) declaratory relief; (ii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iii) reasonable attorneys' fees, costs, and other litigation expenses.

**COUNT II**
**VIOLATION OF THE VPPA – FRANISCO PARTNERS CLASS**
**18 U.S.C. § 2710**

144. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

145. Plaintiff brings this claim individually and on behalf of the members of the proposed Francisco Partners Website Class and the Francisco Partners App Class (collectively, the "Francisco Partners Class") against Defendant Francisco Partners.

146. Defendant Francisco Partners is a "video tape service provider" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as it provided video (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via the Website. Specifically, Defendant Francisco Partners provides pre-recorded, weather-related videos to consumers on the Website and App.

147. Plaintiff and Francisco Partners Class Members are "consumers" as defined by the VPPA because they created accounts and/or downloaded the App, through which they provided Defendant Francisco Partners (and, without consent, the Third Parties) their PII, which was used to track Plaintiff and Francisco Partners Class Members when they viewed pre-recorded video content. 18 U.S.C. § 2710(a)(1). In return for providing their PII, Defendant Francisco Partners also provided Plaintiff and Francisco Partners Class Members with various benefits exclusive to

their accounts. Under the VPPA, therefore, Plaintiff and Francisco Partners Class Members are "subscribers" of "goods or services [the Website, the App, and/or the Weather Channel accounts themselves] from a video tape service provider." 18 U.S.C. § 2710(a)(1).

148. Plaintiff and Francisco Partners Class Members viewed pre-recorded videos on the Website and/or App. During each of these occasions, Defendant Francisco Partners disclosed Plaintiff's and Francisco Partners Class Members' PII. Specifically:

- Plaintiff's and Francisco Partners Website Class Members' (i) first names, (ii) approximate geolocation, (iii) the name of the pre-recorded video watched by Plaintiff and Francisco Partners Website Class Members, and (iv) the URL of the pre-recorded video watched by Plaintiff and Francisco Partners Website Class Members, which also contains the name of the video, were disclosed to mParticle.

- Plaintiff's and Francisco Partners App Class Members' (i) first names, (ii) e-mail addresses, (iii) precise geolocation, and (iv) the name of the pre-recorded video watched by Plaintiff and Francisco Partners App Class Members, were disclosed to mParticle.

- Plaintiff's and Francisco Partners App Class Members' (i) first names, (ii) e-mail addresses, (iii) precise geolocation, and (iv) the name of the pre-recorded video watched by Plaintiff and Francisco Partners App Class Members, were disclosed to Braze.

149. Defendant Francisco Partners' disclosures of Plaintiff's and Francisco Partners Class Members' PII to mParticle and Braze constituted "knowing[] disclosures" of Plaintiff's and Francisco Partners Class Members' "personally identifiable information" to a person as proscribed by the VPPA. 18 U.S.C. § 2710(a)(1).

150. Under the VPPA, the term "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). The information disclosed

by Defendant Francisco Partners constitutes "personally identifiable information" because it allows an ordinary person to identify Plaintiff Francisco Partners IBM Class Members, as well as which specific videos were watched by Plaintiff and each Francisco Partners Class Member.

151. Plaintiff and Francisco Partners Class Members did not provide Defendant Francisco Partners with consent to disclose their PII to third parties, including mParticle and Braze, "in a form distinct and separate from any form setting forth other legal or financial obligations." 18 U.S.C. § 2710(b)(2)(B)(i). Nor were Plaintiff and Francisco Partners Class Members given the opportunity to prevent the disclosure of their PII to third parties, including mParticle and Francisco Partners, "in a form distinct and separate from any form setting forth other legal or financial obligations," and where Plaintiff and Francisco Partners Class Members were provided with the "opportunity, in a clear and conspicuous manner … to withdraw on a case-by-case basis or to withdraw from ongoing disclosures." 18 U.S.C. § 2710(b)(2)(B)(iii).

152. Defendant Francisco Partners' disclosures were not made in the "ordinary course of business," as the term is defined by the VPPA. In particular, Defendant Francisco Partners' disclosures to mParticle and Braze were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

153. On behalf of himself and the Francisco Partners Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Francisco Partners Class by requiring Defendant Francisco Partners to comply with VPPA's requirements for protecting and disclosing a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees, costs, and other litigation expenses.

**COUNT III**
**UNJUST ENRICHMENT**

154. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

155. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants.

156. Plaintiff and Class Members unwittingly conferred a benefit upon Defendants. Defendants procured and retained the contents of Plaintiff's and Class Members' valuable PII belonging to Plaintiffs and Class Members when it disclosed this information to third parties or otherwise monetized this data without Plaintiff's and Class Members' consent.

157. Defendants were enriched when they utilized Plaintiff and Class Members' first names, e-mail addresses, and geolocation information without consent for Defendants' own financial advantage to optimize its advertising and analytics efforts, including by allowing its paying advertisers to target Plaintiff and Class Members for lucrative advertisements based on videos they had viewed, and to analyze Website data to drive traffic and increase revenue.

158. Defendants were enriched when they utilized Plaintiff's and Class Members' first names, e-mail addresses, and geolocation information without consent for its own financial advantage to serve targeted advertisements, to facilitate the real-time bidding process, and to measure performance, all of which enabled Defendants to create operational efficiencies and compete with its competitors.

159. In exchange for Plaintiff's and Class Members' loss of privacy and the financial benefits Defendants enjoyed as a result thereof, including, but not limited to, advertising profits, Plaintiff and Class Members received nothing.

160. It would be inequitable for Defendants to retain the benefits it has unjustly received. Therefore, as a result of Defendants' actions, Plaintiff and Class Members seek an order that Defendants disgorge the profits and other benefits it has unjustly obtained.

161. To be clear, Plaintiff's claim for unjust enrichment is not seeking restitution for Defendants' disclosure of Plaintiff's viewing records to third parties. This claim is strictly seeking restitution for Defendants' monetization of the valuable personal information belonging to Plaintiff and Class Members.

162. Plaintiff has no adequate remedy at law for this claim. Plaintiff pleads his claim for unjust enrichment in the alternative, which inherently would necessitate a finding of no adequate remedy at law. Alternatively, legal remedies available to Plaintiff are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937). Furthermore:

(a) To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.

(b) Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money Defendants wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Plaintiff seeks such relief here.

(c) Legal claims for damages are not equally certain as restitution because claims for unjust enrichment entail few elements.

(d) A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity,

> need not demonstrate the inadequacy of available remedies at law." RESTATEMENT (THIRD) OF RESTITUTION § 4(2).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b) For an order declaring the Defendants' conduct violates the VPPA and constitutes unjust enrichment;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e) For pre- and post-judgment interest in all amounts awarded; and

(f) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and cost of suit.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: December 16, 2024

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: *<u>/s/ Joseph I. Marchese</u>*
Joseph I. Marchese

Joseph I. Marchese
Max S. Roberts
Julian C. Diamond
1330 Avenue of the Americas, 32nd Floor

New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jmarchese@bursor.com
mroberts@bursor.com
jdiamond@bursor.com

*Attorneys for Plaintiff*